IN THE UNITED STATES DISTRCT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| C. Zane Sheehan-Bacus, | ) | Case No. 24-cv-133 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT AND** |
| | ) | **JURY DEMAND** |
| Minnesota Department of Education, | ) | |
| | ) | |
| Defendant. | ) | |

## NATURE OF THE CASE

1.      This is an action under the Americans with Disabilities Act (ADA), 42

U.S.C. § 12201, *et. seq*., the Minnesota Human Rights Act (MHRA), Minnesota Statutes

363A.08, and the Minnesota Whistleblower Act, Minnesota Statutes §181.932, to correct

unlawful employment practices based upon disability and retaliation and to provide

appropriate relief to Plaintiff, C. Zane Sheehan-Bacus (Sheehan).

2.      As alleged with greater particularity below, Sheehan alleges that the

Minnesota Department of Education discriminated against him based on his disability by

failing to accommodate his known disability and discharging him in violation of 42

U.S.C. §12112. MDE retaliated against Sheehan in violation of 42 U.S.C. §12203,

Minnesota Statutes §363A.15 and §181.932 and constructively discharged him from his

employment. Sheehan further alleges that he reported suspected unlawful activity and as

a result was ultimately constructively discharged for making those reports in violation of

the Minnesota Whistleblower Act.

1

## JURISDICTION AND VENUE

3.      This court has jurisdiction pursuant to 28 U.S.C. § 1331, federal question jurisdiction, as the claims arise under the ADA, which are laws of the United States. The Court has supplemental jurisdiction of Sheehan's state law claims under 28 U.S.C. § 1367 (a). Plaintiff timely filed a Charge of discrimination and retaliation jointly with the Equal Employment Opportunity Commission (EEOC) and the Minnesota Department Human Rights. Sheehan received a Notice of Right to Sue from the EEOC and has complied with all administrative requirements.

4.      Venue is proper because all of the employment practices and conduct alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Minnesota.

## PARTIES

5.      Sheehan is a resident of Minneapolis, Minnesota, County of Hennepin. At all relevant times Plaintiff was an employee of the Minnesota Department of Education.

6.      Minnesota Department of Education (MDE) is a state agency of the State of Minnesota and an employer located at all pertinent times in St. Paul, Minnesota, County of Ramsey.

## FACTUAL BACKGROUND

7.      Sheehan began his employment with the MDE on July 8, 2019. His program title was Agriculture, Food, and Natural Resources (AFNR) Specialist, which also included duties as the state advisor for the Minnesota Association of the National FFA Organization (i.e., "FFA"; formerly known as the Future Farmers of America), a

2

student organization aligned with AFNR education under federal Public Law 116-7 and
Minnesota Statute 124D.355. In his role as the FFA State Advisor Sheehan also served as
the chair of the organization's board of directors.

8.      In July 2022, Sheehan observed two incidents and received reports from
school districts of actions he believed to be unlawful on the part of the Executive Director
of Minnesota FFA, in the form of financial wrongdoing and the endangering of student
safety. On July 28, 2022, Sheehan reported these incidents to his supervisor, Michelle
Kamenov. These reports were made prior to FFA opening an investigation into these
incidents.

9.      At his meeting with Kamenov on July 28, 2022, Kamenov told Sheehan not
to act or vote in his role as the FFA board chair. Sheehan advised Kamenov that his role
at MDE is a board director/officer for FFA, and as a board director he had a legal duty to
protect the charitable assets of the organization, and as a licensed teacher to ensure
student safety. Despite having this information Kamenov directed Sheehan not to do his
job, but instead to state that MDE abstains during any vote regarding the Executive
Director's continued employment as it related to the issues he had raised.

10.     Sheehan reported to MDE what he, in good faith, believed to be a violation
of law.

11.     After whistle blowing to his supervisor, Sheehan and the Minnesota FFA
Board of Directors reported their concerns to the University of Minnesota, who was the
fiscal host and employer of FFA's staff members, to start an investigation. University of
Minnesota Human Resources said under no circumstances should the FFA board discuss

these issues publicly while they were conducting their investigation. The FFA board held a private closed session on August 1, 2022, to discuss the matters brought forth by Sheehan, reports from districts, and the University's investigation. On August 3, 2022, the employee in question at Minnesota FFA resigned their position. That same disgruntled former employee then quickly filed twelve allegations against Sheehan with the MDE directly to Kamenov.

12.    After receiving Sheehan's whistleblower complaint on July 28, 2022, his supervisor failed to take action as required. The MDE's Code of Ethics Policy states Kamerov's responsibility was to: "(a) notify the Chief Financial Officer or Human Resources Director of the report within a timely manner, (b) request the employee prepare a written summary of the evidence, if the employee has not yet prepared one, and (c) inform [the]Division Director about the matter and provide all documented information."

13.    Sheehan's supervisor, Kamenov, failed to follow MDE's procedures for whistleblowing complaints, including informing her supervisor or notifying HR and completing a report to document the issues. This failure on the part of MDE management was even more problematic and damaging to Sheehan in light of the fact that after Sheehan made his whistleblower complaint to his supervisor, the subject of that complaint had in short order retaliated with allegations of misconduct against Sheehan.

14.     Instead of following the MDE policy, Kamenov retaliated against Sheehan, harassed him, and placed him on investigative leave for five months beginning September 23, 2022, following the allegations made by the individual Sheehan had filed the whistleblower complaint against and had shortly thereafter resigned.

15.     The disgruntled former employee sent an email to Kamenov with false allegations about Sheehan.

16.     The retaliation began August 5, 2022, when Kamenov removed Sheehan from a project that Sheehan had started a year prior and was a measured goal on Sheehan's performance review. The project was called the CTE TIP project. After removing Sheehan from the project Kamenov also made disparaging comments about Sheehan to one of his peers at work, telling his peer who has no supervision duties, that they need to put Sheehan in his place.

17.     On August 9, 2022, after Sheehan had whistle blown and the disgruntled employee at FFA had resigned, Kamenov altered the July 2022 staff minutes/records a month after the original meeting, to make an upcoming meeting, previously discussed and documented in staff meeting minutes, now appear as more of a priority. The meeting became mandatory, unbeknownst to her team. Kamenov did not communicate these edits to her full team or have the employees she supervises review the revised minutes. Sheehan was not made aware of the revision and Kamenov knew Sheehan was going to be working remotely at the State Fair and not in the office during the meeting.

18.     After the meeting took place, Kamenov sent Sheehan an email about missing the mandatory meeting while he was performing work duties at the Minnesota State Fair. His State Fair duties were included in his work travel plan and Kamenov and Sheehan had frequently discussed them. Kamenov's altering of the CTE staff meeting minutes a month later, after Sheehan had blown the whistle on wrongdoing, to now describe the training as mandatory was intended to punish Sheehan and damage his performance at work.

19.     On September 23, 2022, MDE placed Sheehan on paid investigative leave while they investigated the twelve allegations made by the former employee that had been the subject of Sheehan's whistleblower complaint.

20.     The retaliation against Sheehan continued when on November 9, 2022, Kamenov violated State of Minnesota HR/LR Policy 1445- Code of Ethics by serving on an external hiring committee for a position for which Sheehan was a finalist in the interview process. Kamenov's involvement on the external hiring committee constituted the "appearance of a conflict of interest." Kamenov failed to follow MDE's procedures and policies when she did not report this perceived conflict of interest to MDE Human Resources or receive approval for her participation in the external hiring committee.

21.     Sheehan had been diagnosed with anxiety and depression prior to starting his employment with MDE. Sheehan's medical provider first diagnosed him with anxiety and depression in the summer of 2010 after his mother died, and again in the fall of 2019, after he had completed his doctoral dissertation.

6

22.    Sheehan has been on medication for his anxiety and depression since 2019. His medications were adjusted in late 2022 to better address the severe depression Sheehan was experiencing after having been placed on months of leave and investigation by MDE.

23.    In approximately November of 2022 Sheehan was diagnosed with Post Traumatic Stress Disorder (PTSD). In February 2023 Sheehan's therapist referred him to a trauma focused therapist who confirmed the diagnosis.

24.    On February 9, 2023, while Sheehan was still on leave, Kamenov took the unusual action of assigning one of Sheehan's peers to review all of Sheehan's past work because of alleged "discrepancies." This type of review was retaliatory and did not take place when discrepancies were noticed in content areas managed by other staff she supervised, such as business and marketing, trade and industry, or work-based learning.

25.    On February 22, 2023, MDE held a meeting with Sheehan and the Union to discuss the results of the investigation. The results of the investigation were presented in the form of a letter to Sheehan.

26.    Another meeting was held on February 23, 2023, to discuss the findings. At this meeting, Sheehan pointed out many errors in the MDE letter.

27.    Most of the twelve allegations made about Sheehan by the disgruntled employee who was the subject of the whistleblower complaint could not be substantiated and were dismissed.

28.    Upon Sheehan's returning to work on February 27, 2023, he shared his PTSD diagnosis in a meeting with his supervisor, Kamenov, and her boss, Director Sally Reynolds. Sheehan advised his supervisors that he was in weekly therapy and that his disability would impact his work.

29.    On February 23, 2023, Sheehan completed the paperwork to formally request accommodation of his disability (PTSD) by the MDE. MDE Human Resources noted the date they started the process as March 1, 2023, and they had 30 days to respond to Sheehan's request for accommodation.

30.    When asked by MDE HR what was interfering with his ability to work Sheehan said, "Hostile supervisor who is abusive, harasses, and retaliatory, specifically triggering PTSD and anxiety. – Intense interactions and micromanagement feel designed to cause trauma (A.4, B.3., B.4). – Supervisor refusing to complete performance reviews using goals and position description from multiple years triggers distress and fear of relived trauma (B.3) – Unscheduled aggressive and unequal feedback compared to peer causes disassociative [sic] reactions about past trauma reoccurring (B.3.) – Back pain and recurring dreams and sleeping walking during periods of intense stress and trauma. (B.2). – Avoidance of coworkers/supervisor to prevent traumatic events (C.2.) – Self destructive and irritable behavior (E.)" and "Prolonged trauma following investigatory leave after whistleblowing, which led to the investigation, causing exaggerated negative beliefs about agency and distrust. (B.4.,D.2., E.)."

31.     When describing the accommodations he needed from MDE Sheehan told them, "flexible work environment/work from home and reduce physical interactions with abusive supervisor who triggers PTSD." He also requested "modification of supervisor's methods… scheduled meetings with prior notice that have a clear agenda and objectives." MDE HR soon thereafter approved medical leave for Sheehan under the Family Medical Leave Act (FMLA).

32.     After his return to work, Sheehan needed to use intermittent medical leave several times as a result of Kamenov's harassment that triggered his PTSD episodes; he used extended medical leave twice when his medical provider ordered it as a result of how severe the harassment/retaliation had become.

33.     It took over a month before MDE HR even began drafting the reasonable accommodations, followed by several weeks of meetings to finalize them.

34.     Upon Sheehan's return to work, Director Reynolds required Sheehan to have weekly meetings with Kamenov after being out of the office for several months.

35.     Kamenov changed the weekly meetings to daily meetings and without an agenda.

36.     This action by Kamenov was more retaliation against Sheehan and an effort to micromanage and further harass him.

37.     On March 2, 2023, the Union requested the daily meeting be removed.

38.     Kamenov's retaliation continued when she destroyed Sheehan's work product, from more than a year earlier, to revise AFNR course codes and descriptions. This project was funded by federal dollars, completed by a statewide committee of AFNR

teacher experts, and was an additional measured goal on Sheehan's performance review. The project was previously presented to her, she approved it, and MDE had already published it to districts and updated information in data systems to reflect the changes. Kamenov reversed several of the changes and required Sheehan to revise hundreds of files and documents.

39.     Sheehan sustained an intense PTSD response after he realized that Kamenov had ordered an employee to audit his work on the course codes project, as well as all his work during the past four years, to look for mistakes. He was not aware of this audit until after he had returned to work from his investigatory leave.

40.     Kamenov denied an MDE partner's request to have Sheehan speak at an event he had previously attended each year. She notified Sheehan of this decision just hours before the event was to begin and directed him to communicate this message to the partner himself. Kamenov's last minute decision made Sheehan look unprofessional to the partner organization and damaged his professional reputation.

41.     On March 6, 2023, Sheehan's health care provider sent MDE an FMLA certification that stated: "Due to trauma condition (complex PTSD) working while triggered by current boss."

42.     On March 7, 2023, Sheehan was subjected to bullying by Kamenov and he was forced to leave midday on medical leave. Kamenov's only response to Sheehan's leaving was to chastise him for allegedly not leaving an appropriate "out of office" message, specifically for not using "required language" neither she nor any other staff she supervises use in their out of office messages.

10

43.    Sheehan filed a detailed Formal Complaint under Respectful Workplace Policy HR/LR Policy 1432, dated March 9, 2023, regarding his continued disrespectful and retaliatory treatment by Kamenov.

44.    In further retaliation, Kamenov required Sheehan to file a new travel request form for his duties at the FFA State Convention, an annual event of 5,000 students, teachers, parents, community leaders, and partners. Sheehan had never had to file this form before, but did so on March 15, 2023. As the State Advisor for the organization putting on the Convention, Sheehan had considerable duties at the event (over a period of four days), including managing programs and speaking at each session, as well as a keynote address. The MDE AFNR specialist had performed these duties for more than ninety years. Two weeks later Kamenov had still not responded to his request. In the end, Kamenov did not want Sheehan to attend more than two days despite his having duties on all four.

45.    The retaliation continued when on March 20, 2023, Kamenov, with support from Director Reynolds, removed Sheehan from a three year federally funded United States Department of Agriculture grant project known as "ADLTS." MDE was one of three partners on the ADLTS grant with the University of Minnesota and Minnesota FFA. Sheehan was the primary author of the ADLTS grant. MDE had signed to approve the grant prior to submission and supported it during the two years prior.

46.    On March 29, 2023, Kamenov asked Sheehan for an update and which two days he planned to attend the FFA State Convention. Sheehan had a meeting with Kamenov, the Union, and Director Reynolds where he said he did not want to be in the

middle because he feared if he advocated for all four days of the event, there would be further retaliation, and if he did not, it would damage his reputation and work performance with a partner organization. Kamenov ended the meeting early because there was disagreement about what path to take. The meeting triggered a PTSD episode for Sheehan, the third time in less than a month.

47.    On March 30, 2023, Sheehan's health care provider put him on extended disability medical leave for treatment. The provider's certification, sent to MDE on March 30, 2023, stated, "Due to increasing frequency of triggering episodes from harassment at work, client requires multiple times per week psychotherapy sessions. Employee will not be able to perform any of the essential job functions due to the stress and traumatic triggers caused by retaliation and harassment his boss occurring consistently and persistently."

48.    On April 17, 2023, Sheehan sent an email to Lynn Link, MDE HR about the need to finalize disability accommodations to prevent Kamenov's harassment and retaliation.

49.    Sheehan filed an amendment to his earlier complaint to update the external investigator MDE hired regarding Kamenov's behavior since he had made his first complaint on March 9, 2023.

50.    Sheehan continued to try and get help and reasonable accommodations. On April 21, 2023, Sheehan emailed Link in MDE HR advising her that it is "difficult to perform my job and function without the accommodations, so I am eager to have them in place."

51.     In the end, Kamenov would not let Sheehan attend the FFA State Convention at all, a major if not the most important event for his position each year, as he was the organization's state advisor, and it was an opportunity to engage with hundreds of AFNR teachers and partners, and thousands of students. When Minnesota FFA asked MDE why Sheehan would not be attending the event, MDE said it was due to is medical leave and disability. However, Sheehan returned to work from medical leave prior to the event. Kamenov forced Sheehan to sit in his cubicle while the event was happening just a few miles away. Kamenov attended the event herself even though she was not invited to attend and did not have any work-related duties at the event, nor did she attend to fulfill any of Sheehan's duties.

52.     For a third time, Sheehan sent the investigator a report detailing the additional harassment and retaliation he was receiving from Kamenov. Sheehan noted HR had not heard from him, the investigator, since the original meeting.

53.     Minnesota Department of Agriculture (MDA) Commissioner Thom Petersen met with Sheehan and told him MDA employees were hearing concerning reports. MDA employees had heard a rumor being discussed within the Agriculture industry that Sheehan was not attending events anymore – specifically, student FFA events – because Sheehan might have done something inappropriate (i.e., sexual) with a student. Commissioner Petersen told Sheehan they had put a stop to the rumors and tried to shut it down. Because MDE was not saying anything and had continued to allow Kamenov to aggressively retaliate against him, Sheehan's reputation had been irreparably tarnished.

54.    Kamenov met with Sheehan and MDE data specialist Kari-Ann Edger on May 8, 2023, to review Sheehan's mistakes – error by error.

55.    MDE scheduled a meeting to review the ADA plan with Kamenov and Sheehan. Kamenov cancelled because she was "not ready." An MDE HR staff member met with Sheehan anyway and told Sheehan about their frustrations with Kamenov.

56.    On May 11, 2023, Kamenov and Sheehan meet with MDE to review a final ADA plan with all parties. Approximately two weeks later HR sends the ADA plan to the parties for signature.

57.    Sheehan sent Kamenov an email documenting that Kamenov's weekly meeting notes were inaccurate and did not reflect the meeting discussion/business. This was a consistent concern discussed often.

58.    On May 12, 2023, Kamenov attempted to schedule Sheehan's 3-year performance review, almost a year after it was supposed to be conducted (Sheehan was hired in July 2019), for May 27, 2023. Sheehan reminded her that she must give him two weeks' notice to review her contributions and feedback prior to the review meeting, which she had not yet sent. Kamenov said she did not understand why Sheehan needed two weeks and Sheehan referred his supervisor to the MDE policy. A few days later Kamenov sent her feedback, which did not include any negative comments.

59.    Sheehan emailed HR to report Kamenov violating performance review policy and that the action is an example of the behavior impacting his disability need.

60.    Sheehan emails HR Director Tammy Funk and Director Reynolds on May 19, 2023, about the continued retaliatory treatment by Kamenov and how she has pushed back and resisted the agreed upon reasonable accommodations. Sheehan noted that he had had meetings with Kamenov on return to work, disability accommodation, and the reported harassment yet nothing changes. Sheehan tells MDE the situation is untenable, but he has no desire to quit, and that it's only a matter of time before Kamenov fires him. Sheehan also told MDE that Kamenov's actions continue to trigger his PTSD and negatively impact his health. He asks for advice and coaching and tells them things are not working, both procedurally as an employee and his own mental and physical health and disability needs. Sheehan tells MDE he does not know what to do anymore.

61.    Director Reynolds responds to Sheehan's email, generally ignoring his concerns but also telling him his email signature email is incorrect. Sheehan's email signature job title and phone had not changed in the four years since he first set it up. HR Director Tammy Funk does not respond at all to Sheehan's email.

62.    The MDE retaliates against Sheehan and removed him as FFA State Advisor, duties that are prescribed in Minnesota FFA's constitution and supported by federal and state law. MDE and the AFNR specialist role have performed these duties for more than ninety years. MDE specifically asked FFA staff to remove that title next to Sheehan's name on their website, or ideally remove Sheehan's name altogether. When FFA challenged this request MDE invited FFA to a meeting in the future and encouraged FFA staff to bring legal representation.

63.    By this point Kamenov had now stripped Sheehan of most of his duties.

64.     On May 23, 2023, Sheehan met with HR and pleaded with them to send the ADA plan as Kamenov's harassment and retaliation continued. MDE sent Sheehan's accommodation plan for signatures and it was signed by all parties.

65.     On May 31, 2023, Dr. Amy Smith from the University of Minnesota emailed MDE about Sheehan's role on the federal ADLTS grant. Director Reynolds reversed her prior decision to remove Sheehan from the grant after the University of Minnesota pushed back. The University of Minnesota had received an extension on the grant, as the project was behind schedule, at least partially due to Sheehan's leave of absence and MDE not fulfilling those duties. Director Reynolds then clarified that MDE would not participate in the grant extension, therefore, Sheehan was to complete all the remaining work within thirty days. This was an unrealistic expectation.

66.     On June 5, 2023, Kamenov violated MDE's signed disability accommodation agreement with Sheehan by scheduling a meeting with him without an agenda. Sheehan, again emailed MDE HR, saying, "It continued to be increasingly difficult, nearly impossible, for me to work here with a supervisor who continues to harass and demean me consistently for everything I do, ignores disability modifications we agreed to."

67.     Kamenov and Director Reynolds met with Sheehan on June 6, 2023. At the meeting they made vague allegations that Sheehan was asking others on the team for help. When Sheehan asked for clarity or examples, they refused. Kamenov said Sheehan was now only allowed to speak about his work to her. She said any questions should go through her and he could no longer talk to any of his peers. Kamenov also claimed

Sheehan interjected himself into a conversation others were having, which even if true, was an odd "concern." Again, there was no agenda for this meeting either and contrary to the agreed upon ADA plan Sheehan had in place with MDE and signed just days before.

68.    Kamenov conducted Sheehan's three-year review on June 6, 2023. She did not conduct a year-two review for Sheehan despite being his supervisor at the time and in violation of MDE policy and Union contract. The last performance review that Sheehan had received was year one, in 2020 when Kamenov had rated Sheehan "exceeds expectations."

69.    In the year three review meeting Kamenov did not share any significant concerns with Sheehan about his performance. Yet the next day Kamenov sent Sheehan the final report for him to sign, which now contained scathing feedback that, contrary to MDE policy, Sheehan was hearing for the first time. Kamenov included feedback about events and topics outside the review period. Kamenov also noted concerns about Sheehan's performance for which she rated him "does not meet expectations and not approved for progression increase" and that wrongfully related to Sheehan's disability.

70.    Once again Kamenov did not have an agenda for her weekly meeting with Sheehan on June 7, 2023, and in violation of the reasonable accommodation agreement MDE had made with Sheehan. Kamenov attempted to say the agenda was in the meeting invitation when it was not. Sheehan again reported this violation to MDE HR as yet another direct disability accommodation violation.

71.     This failure again by MDE to comply with their agreed upon disability accommodation plan with Sheehan caused a severe anxiety attack for Sheehan, again, and led to his medical provider ordering him on extended FMLA leave.

72.     On June 8, 2023, Sheehan's medical provider ordered him on extended medical leave due to Kamenov's continued aggressive harassment, specifically related to the performance review.

73.     Sheehan emailed MDE HR staff Lynn Link and said he had been "placed on extended FMLA leave again by my medical team due to Michelle Kamenov continuing to trigger PTDS episodes with her harassment and violating the disability accommodations plan we agreed to."

74.     On July 5, 2023, Sheehan sends MDE his resignation letter outlining how he was constructively discharged because of the continuing discriminatory and retaliatory treatment the MDE has subjected him to in a work environment that is unhealthy and intolerable. Sheehan tells MDE he filed a formal report that his supervisor Kamenov had broken the law in addition to violating several agency and state policies. Sheehan advised MDE in his letter of his efforts to make it stop and the agency doing nothing. He spoke of the significant negative impact this has had on his health and continuing irreparable damage his supervisor, Kamenov, had done to Sheehan's reputation, and that he was left with no choice but to leave his position. This constructive discharge resulted in a wrongful termination that is illegal under federal and state law.

75.    As a direct result of the unlawful and discriminatory conduct of MDE,

Sheehan has been injured and sustained damages for mental anguish, lost income, pain,

suffering, attorney fees and costs, and other damages.

## JURY DEMAND

76.    Plaintiff hereby demands a trial by jury on any issue triable as a matter of

right.

## COUNT I
## DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §12201, et. seq.

77.    Plaintiff incorporates by reference paragraphs 1 through 75 and

incorporates them herein.

78.    Defendant's actions as set forth above constitute a violation of the ADA in

violation of 42 U.S.C. §12112.

## COUNT II
## RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §12203

79.    Plaintiff incorporates by reference paragraphs 1 through 75 and

incorporates them herein.

80.    Defendant's actions as set forth above constitute retaliation against Plaintiff

in violation of 42 U.S.C. §12203.

## COUNT III
## DISABILITY DISCRIMINATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT, MINNESOTA STATUTES §363A.08

81.    Plaintiff incorporates by reference paragraphs 1 through 75 and

incorporates them herein.

82.    Defendant's actions as set forth above constitute a violation of the MHRA in violation of Minnesota Statutes §363A.08, subdivision 6, by failing to provide reasonable accommodations for Sheehan's known disability.

## COUNT IV
## REPRISAL AND RETALIATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT, MINNESOTA STATUTES §363A.15

83.    Plaintiff reincorporates by reference paragraphs 1 through 75 and incorporates them herein.

84.    Defendant's actions as set forth above constitute reprisal and retaliation against Plaintiff for his protected actions under Minnesota Statutes §363A.15.

## COUNT V
## VIOLATION OF THE MINNESOTA WHISTLEBLOWER STATUTE MINNESOTA STATUTES §181.932

85.    Plaintiff reincorporates by reference paragraphs 1 through 75 and incorporates them herein.

86.    Defendant's actions as set forth above constitute retaliation against Plaintiff for his good faith reporting of suspected violations of law, rules, and policy in violation of Minnesota Statutes §181.932.

WHEREFORE, Plaintiff prays for Judgment against Defendant as follows:

1.    Damages for pain and suffering under each of Counts I through V.

2.    Damages, including lost income, employment benefits, or other compensation, past and future, denied to Plaintiff by reason of the violations under Counts I through V.

3.      Treble damages as allowed under the Minnesota Human Rights Act,

Minnesota Statutes Section 363A.29, subd. 4, for violations under Counts III and IV.

4.      Injunctive and equitable relief the court deems appropriate, including front

pay, as allowed.

5.      Pre-judgment and judgment interest on all amounts awarded.

6.      All damages and relief as available by law.

7.      Attorney's fees, costs, and disbursements as available under the ADA, the

MHRA and the Minnesota Whistleblower Act.

8.      For such other and further relief as the court deems just and equitable.


Dated: January 17, 2024                          **FIEBIGER LAW, LLC**

                                                 By: s/Rolf T. Fiebiger_____
                                                 Rolf T. Fiebiger (#391138)
                                                 Thomas D. Fiebiger (#307506)
                                                 6800 France Ave S., Suite 190
                                                 Edina, MN 55435
                                                 Telephone: 612.888.6084
                                                 Telephone: 612.399.6474
                                                 rolf@fiebigerlaw.com
                                                 tom@fiebigerlaw.com

                                                 Attorneys for Plaintiff